## Britt v. Houser.

(Decided October 17, 1916.)

### Appeal from McCracken Circuit Court.

1.  **Adverse Possession—Requisites of.**—To satisfy the requirements of the doctrine of adverse possession the holding must be adverse, open, actual and continuous, and to a well-marked boundary.

2.  **Adverse Possession—Continuity of Possession.**—Continuity of possession is an essential link in the perfection of a title by adverse possession, but this does not mean that in all cases and with respect to all species of property it is indispensable that the

adverse claimant should be at all times in the adverse possession of the property either by residence or enclosure or cultivation; for it is allowable in determining the sufficiency of the continuity of the possession to take into consideration the nature, character and location of the property and the uses to which it has been or may be. put.

3. Adverse Possession—Continuity of Possession.—But with respect to all classes of property the continuity of possession and the use to which the property is put must be of such a nature as to put the real proprietor upon notice that a hostile claim is asserted.

4. Adverse Possession—Continuity of Possession.—Disconnected periods of occupancy or occasional entries will not be sufficient to answer the requirements of continuity, and if the continuity be broken by voluntary abandonment, or by the surrender of the premises to another, or by any other act that would indicate that the adverse holder was not asserting claim to the property, it will be fatal to his case.

5. Adverse Possession—Continuity of Possession—Overflow Land.— Where land is subject to periodical overflow of such nature and extent as to make it impractical to keep the land continuously inclosed or in cultivation and to prevent it from being occupied by a residence or outbuildings, the failure to have it continuously enclosed or cultivated or inhabited will not break the continuity of possession if the possession is as continuous as natural conditions will permit.

A. M. NICHOLS, JOHN K. HENDRICK and E. H. PURYEAR for appellant.

ARTHUR Y. MARTIN, WHEELER & HUGHES and BAGBY & MARTIN for appellee.

Opinion of the Court by Judge Carroll—Affirming.

The appellant, Britt, brought a suit in ejectment against the appellee, Houser, seeking to recover the possession of a body of land situated in McCracken county, containing about 73 acres.

The answer of Houser was a traverse and an affirmative plea of ownership.

On the trial of the case it developed that the defense of Houser and his claim of ownership were rested entirely on adverse possession, and so the court confined the issues to this question, by instructions that are not criticised.

The jury, after considering the case, found a verdict in favor of Houser, and on this appeal by Britt from the judgment on the verdict his principal contention is that the evidence of adverse possession was wholly insufficient to satisfy the requirements of the law and there-

fore the court should have directed a verdict in his favor.

The evidence shows that the land in controversy was at one time owned by R. F. Woods, who had before his death in 1878 sold it by title bond to Daniel J. Britt. After the death of Woods, Daniel J. Britt, the father of the appellant, Britt, instituted an action in the McCracken circuit court against the heirs of R. F. Woods to secure the title to the land under the bond conveying it to him. In this suit there was a judgment in 1880 giving to Daniel J. Britt the relief sought, and the commissioner of the court was ordered to and did prepare a deed conveying to Britt this land now in controversy, which deed was directed by the court to be certified to the clerk of the McCracken county court for record, but for some reason it was never placed on the records of the county court. Daniel J. Britt never disposed of this land, and died in 1906, leaving surviving him the appellant, H. M. Britt, and other children whose interest in the land was subsequently purchased by the appellant.

It appears that Daniel J. Britt, as well as the children, lived in the state of Illinois, and that neither Daniel J. Britt nor any of his children ever took possession, either in person or by tenants, of the land in controversy, nor did they exercise over it any acts of ownership whatever from 1880 until shortly before this suit was brought in 1915. Why Daniel J. Britt or his children never exercised any acts of ownership over the land does not appear. But it seems that about 1913 the appellant discovered in some way that his father, Daniel J. Britt, by the judgment before mentioned became entitled to the land, and after making this discovery he bought the interest of the other Britt children and set up claim to the land.

It will thus be seen that although Daniel J. Britt became the owner of the land in 1880 by virtue of the court proceedings, neither he nor any of his children asserted any claim to the land, or had it in possession, or exercised any acts of ownership over it until 1913, a period of about thirty-three years.

Turning now to the evidence in behalf of Houser, it shows that this land is situated on the bank of the Ohio river and is subject to periodical overflows of such nature and extent as to make it impracticable to keep the land continuously in cultivation or enclosed by fencing

and to prevent it from being occupied by a residence or outbuildings. A residence that was on the land at one time was washed away by a flood, and the fencing with which it was enclosed, or had been partly enclosed at different times, was also washed away.

It also appears that the children of R. F. Woods did not know of the effect of the suit brought by Britt, nor did they have any actual notice or information from any source that R. F. Woods did not own the land at his death or that it did not descend to them, until the appellant, Britt, asserted claim to it for the first time in 1913. Between the death of R. F. Woods, in 1878, and 1913, the land was assessed to the Woods' heirs and the taxes were paid by them. They believed during all these years that they were the owners of the land, as no person at any time asserted any claim or title to it or interfered with their possession. During these years no person lived on the land, but it was wholly or at least partly enclosed by fencing, except for a few years when the fencing was washed away by high water. It was cultivated in crops by the Woods heirs and their tenants at different times during these thirty-three years, although there were years in which it was not cultivated by any person. The Woods heirs also cut timber from the land when they wanted it, and pastured it. In short, they exercised at all times such acts of ownership over it as they would have done if, in fact, they had been at all times the real owners of the land; and it was generally regarded and spoken of in the neighborhood as the land of the Woods heirs.

It may be further here said that if the Britts had at any time from 1880 to 1913 made any inquiry concerning the land, they would have learned that it was in the possession of and under the control of the Woods heirs, who were exercising as frequently as natural conditions would permit such acts of ownership over the land as would put a person of ordinary prudence on notice that they were asserting title to it.

To satisfy the requirements of the doctrine of adverse possession the holding must be adverse, open, actual and continuous to a well marked or well defined boundary. The reason these requirements are essential is because it may well be presumed that when land is openly and visibly occupied by another than the owner to a well defined boundary and this occupancy is continuous and accompanied by an assertion of title and such

other acts of ownership as the rightful owner might exercise, they will be sufficient to put the real owner upon notice of the hostile claim to his property and will furnish him opportunity to assert his title or take such other steps as he may desire to eject the intruder. The presumption is that the real owner of land occasionally at least takes some notice of his possessions or makes some inquiry about them, and when he does he can easily ascertain whether they are free from intruders or in the adverse possession of some hostile claimant, if the possession of this claimant is accompanied by the acts we have described, and consequently the rightful owner cannot be disseized of his property if he exercises such care in looking after it as a person of ordinary prudence might be supposed to exercise.

It is said, however, by counsel for Britt that the evidence shows lack of continuity in the possession by the Woods heirs and therefore their claim of title by adverse possession must fail.

It is undoubtedly true that continuity of possession is an essential link in the perfection of a title by adverse possession: Hellard v. Hubbard, 160 Ky. 304. But this does not mean that in all cases and with respect to all species of property, wherever situated, or however used, it is indispensable that the adverse claimant should be at all times in the actual possession of the property either by residence or enclosure or cultivation; for it is allowable, in determining the sufficiency of the continuity of the possession, to take into consideration the nature, character and location of the property and the uses to which it has been or may be put. For example, the use to which some property is and may be put, its location, its value and its surroundings, may be such that it would be necessary to apply a more stringent rule of continuity of possession to perfect a title than would be required in other cases. Thus it was said in Singleton v. Trustees, 10 Ky. L. R. 851:

"It has been repeatedly held by this court that a possession, such as the nature of the real estate will admit of and is necessary for the use it is applied to, may be regarded as actual, continuous and adverse, though not in the actual use or occupancy of the owner all the time. And accordingly possession of a parcel of land for school purposes for such length of time each year as school is taught, is to be regarded such in the meaning of the law

as will, if continued for fifteen years, give a perfect title.''

In Webbs v. Hynes, 9 B. Mon. 388, it appears that the land in dispute was an island in the Ohio river, and one of the chief questions in the case related to the continuity of possession by the adverse claimant. In discussing the necessity for unbroken possession, the court said: ''If a fence was unnecessary to its enjoyment, and if it was used by the defendants in the way most appropriate, considering its nature and liability to be inundated, and that use was continued whenever the condition of the land would permit, we entertain no doubt such use would constitute an adverse possession, which if continued uninterruptedly for twenty years before suit was brought, would be sufficient to toll the right of entry of the elder patentee.''

But with respect to all classes of property the continuity of possession and the use to which the property is put must be of such a nature as to put the real proprietor upon notice that a hostile claim is asserted. Disconnected periods of occupancy when there is no obstacle such as here existed or occasional entries for purposes of pasture or cutting timber or cultivation will not be sufficient to answer the requirements of continuity: Smith v. Chapman, 160 Ky. 400. And if the continuity of possession be broken by voluntary abandonment, or by the surrender of the premises to another, or by any other act that would indicate that the adverse holder was not asserting claim to the property, it will be fatal to his case.

Measured by these rules we think the actual possession of this land by the Woods heirs was as continuous as the natural conditions would permit and sufficient to take the case to the jury and to authorize them to find that the possession had been continuous.

Some question is also made as to the competency of certain evidence offered, but we do not think this evidence was of sufficient importance to justify a reversal of the case even if it should be thought not admissible. In fact, the incompetency of the evidence is rather due to the improper and leading method employed in asking questions than to any inherent incompetency in the answers of the witnesses.

The judgment is affirmed.